1
2
3
4
5
6
7

**FILED**
CLERK, U.S. DISTRICT COURT

12/14/2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____CDO_____ DEPUTY

8          UNITED STATES DISTRICT COURT

9        FOR THE CENTRAL DISTRICT OF CALIFORNIA

10             January 2023 Grand Jury

| | |
|---|---|
| 11  UNITED STATES OF AMERICA, | CR No. 2:23-cr-00632-HDV |
| 12           Plaintiff, | I N D I C T M E N T |
| 13           v. | [50 U.S.C. § 1705(c): Conspiracy to Violate the International Emergency Economic Powers Act; 18 U.S.C. §§ 1349: Conspiracy to Commit Bank Fraud; 18 U.S.C. § 1956(h): Conspiracy to Commit Money Laundering; 18 U.S.C. §§ 981, 982 and 28 U.S.C. § 2461(c): Criminal Forfeiture] |
| 14  KAMBIZ EGHBALI,  aka "Cameron Eghbali," | |
| 15  HAMID HAJIPOUR, and  BABAK BAHIZAD, | |
| 16           Defendants. | |
| 17 | |

20     The Grand Jury charges:

21  INTRODUCTORY ALLEGATIONS:

22     At all times relevant to this Indictment:

23                    The Conspirators

24     1.  Defendant KAMBIZ EGHBALI, also known as "Cameron Eghbali"

25  ("EGHBALI"), was the founder and Chief Executive Officer of

26  Company 1, a purported videogame wholesaler and distributor located

27  in North Hills, California.  EGHBALI was a citizen of the United

28  States and of the Islamic Republic of Iran ("Iran") and resided in

1    the Central District of California.

2        2.    Co-Conspirator 1 was a national of Iran, resided in Iran,

3    and founded and controlled Company 2, an Iranian company, and

4    Company 3, a Turkish front company.

5            a.    Company 2's advertised purposes included assisting

6    Iranian citizens with financial transactions with businesses based in

7    the United States.

8        3.    Defendant HAMID HAJIPOUR was a national of Iran, resided in

9    Iran, and founded and controlled Company 4, an Iran-based company.

10           a.    Company 4 advertised itself as a service for

11   downloading mobile applications in Iran with direct links for

12   Android, iOS, and other computer software.

13       4.    Defendant BABAK BAHIZAD was a national of Iran, resided in

14   Iran, and was an employee of Company 5, an Iranian company.

15           a.    Company 5 advertised itself as the "gate to Iran's

16   gaming market" and claimed that it imported products from the United

17   States, Europe, and the United Arab Emirates.

18   <u>The International Emergency Economic Powers Act and the Iranian
         Transactions and Sanctions Regulations</u>

19

20       5.    The International Emergency Economic Powers Act ("IEEPA"),

21   50 U.S.C. § 1701, <u>et seq.</u>, granted the President of the United States

22   the authority to deal with unusual and extraordinary threats to the

23   national security, foreign policy, or economy of the United States.

24   Pursuant to that authority, the President may declare a national

25   emergency through Executive Orders that have the full force and

26   effect of law.  Among other things, IEEPA empowers the President to

27   impose economic sanctions on a foreign country.  It is a crime to

28   willfully violate, attempt to violate, conspire to violate, or cause

a violation of any order, license, regulation, or prohibition issued pursuant to IEEPA.  50 U.S.C. § 1705(a), (c).

6.    On March 15, 1995, the President issued Executive Order 12,957, which found that the actions and policies of the government of Iran constituted an unusual and extraordinary threat and declared a national emergency under IEEPA to deal with that threat.  60 Fed. Reg. 14,615 (Mar. 17, 1995).  In two subsequent Executive Orders in 1995 and 1997, the President imposed comprehensive sanctions on Iran and clarified the original declaration of a national emergency.  See Exec. Order No. 13,059, 62 Fed. Reg. 44,531 (Aug. 21, 1997); Exec. Order No. 12,959, 60 Fed. Reg. 24,757 (May 9, 1995).  Since 1997, the President has continued the national emergency with respect to Iran and the 1995 and 1997 Executive Orders.

7.    To implement the sanctions, the Secretary of the Treasury, through the Office of Foreign Assets Control ("OFAC") promulgated the Iranian Transactions Regulations, 31 C.F.R. Part 560, which were subsequently renamed to the Iranian Transactions and Sanctions Regulations ("ITSR").

8.    The ITSR generally prohibit the exportation, reexportation, sale, or supply, directly or indirectly, from the United States or by a United States person (wherever located), of any goods, technology, or services to Iran or the Government of Iran without having first obtained OFAC authorization.  31 C.F.R. § 560.204.

9.    The ITSR prohibition on the exportation, reexportation, sale, or supply of services to Iran or the Government of Iran contained in 31 C.F.R. § 560.204 includes financial services, and applies to (1) the transfer of funds, directly or indirectly, from the United States or by a U.S. person (wherever located), to Iran;

and (2) the provision, directly or indirectly, of money remittance services to Iran.  31 C.F.R. § 560.427.

10.  The ITSR also prohibit conspiring to violate any ITSR prohibition, and any transaction that evades or avoids, that has the purpose of evading or avoiding, that causes a violation of, or that attempts to violate an ITSR prohibition.  31 C.F.R. § 560.203.

11.  At no time did EGHBALI, HAJIPOUR, BAHIZAD, or Company 1 apply for, receive, or possess a license from OFAC to export, reexport, sell, or supply goods, services, or technologies from the United States to Iran or the Government of Iran.

<u>Relevant Financial Institutions</u>

12.  Manufacturers Bank, Wells Fargo, Bank of America, and California Bank & Trust were financial institutions in the United States, which were located within the Central District of California and elsewhere, whose accounts were insured by the Federal Deposit Insurance Corporation ("FDIC").

13.  EGHBALI maintained, as the sole signatory, bank accounts with Bank of America (ending in 7246), Wells Fargo (ending in 9820), and California Bank & Trust (ending in 7744).  EGHBALI also maintained, as joint signatory, a bank account with Manufacturers Bank (ending in 5332).

4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>COUNT ONE</u>

[50 U.S.C. § 1705(c)]

[DEFENDANTS KAMBIZ EGHBALI AND BABAK BAHIZAD]

14.  The Grand Jury incorporates and realleges the allegations set forth in paragraphs 1 through 13, above, as if fully set forth herein.

A.  <u>OBJECTS OF THE CONSPIRACY</u>

15.  Beginning at least as early as in or around March of 2014, and continuing up to and including at least in or around September of 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendants KAMBIZ EGHBALI, also known as "Cameron Eghbali" ("EGHBALI") and BABAK BAHIZAD ("BAHIZAD") (collectively, the "defendants") and others known and unknown to the Grand Jury, knowingly conspired and agreed with each other to:

a.   Engage in and cause a transaction that evades and avoids, that has the purpose of evading and avoiding, that causes a violation of, and that attempts to violate an ITSR prohibition, in violation of 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.203;

b.   Export, reexport, sell, and supply, directly and indirectly, from the United States and by a United States person (wherever located), goods, technology, and services to Iran or the Government of Iran, without having first obtained OFAC authorization, in violation of 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.204.

B.  <u>MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE</u>
   <u>ACCOMPLISHED</u>

16.  The objects of the conspiracy were to be accomplished in substance as follows:

a.   Defendant BAHIZAD would send orders from Iran to

5

defendant EGHBALI in the Central District of California to request that defendant EGHBALI transfer goods, technology, and services, in the form of digital and physical gift cards loaded with U.S. dollars, to him for the benefit of Company 5.

b.   Defendant EGHBALI would send defendant BAHIZAD invoices listing the number, type, and cost of gift cards that he proposed to send and identifying third-party entities as the purchaser of the gift cards and listing Company 1 as the seller.

c.   Defendant BAHIZAD would pay defendant EGHBALI for the gift cards by transferring money from Iran to defendant EGHBALI's Bank of America, Wells Fargo, Manufacturers Bank, and California Bank & Trust bank accounts in the United States, using third parties in other countries to conceal from banks and U.S. regulators that the transfers were related to the provision of goods, technology, and services to Iran.

d.   Defendant EGHBALI would transfer the requested gift cards in digital and physical form loaded with U.S. dollars to defendant BAHIZAD in Iran for the benefit of Company 5.

C.   OVERT ACTS

17.   In furtherance of the conspiracy and to accomplish its objects, on or about the following dates, defendants EGHBALI and BAHIZAD, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California and elsewhere, including but not limited to the following:

Overt Act No. 1:   On March 27, 2014, defendant BAHIZAD caused $2,600 to be wired into defendant EGHBALI's Manufacturers account (ending in 5332).

Overt Act No. 2:   On March 27, 2014, defendant EGHBALI e-

mailed defendant BAHIZAD, confirming he received $2,600 from defendant BAHIZAD but inquiring about a payment that was past due.

Overt Act No. 3:    On March 27, 2014, defendant BAHIZAD responded, "[t]here is no way to transfer money till holidays be finish.  If I make a money order by unusual people it will take long time & will be no different that I wait to trust person come back to work.  The main unpaid invoice is INV#84217 by 55,742$ that you let me paid after Norooz [the Iranian New Year] holidays."

Overt Act No. 4:    On April 29, 2014, after defendant EGHBALI e-mailed defendant BAHIZAD to express his disappointment regarding an incomplete payment, defendant BAHIZAD wrote, "Nooo!  This is not that amount that I told you.  This is a person in Canada that usually transfer about 2000$ every 7~10 days.  Don't worry.  I arranged the money order as I told you."

Overt Act No. 5:    On January 13, 2015, defendant BAHIZAD caused $49,975 to be wired from an entity with the initials C.G.T. in the United Arab Emirates into defendant EGHBALI's Manufacturers account (ending in 5332).

Overt Act No. 6:    On January 13, 2015, defendant BAHIZAD sent an e-mail from his Company 5 e-mail to defendant EGHBALI at his Company 1 e-mail with the subject line "50k" and with an attachment summarizing a transaction to Company 1 for $50,000USD from C.G.T. in the United Arab Emirates.

Overt Act No. 7:    On September 2, 2015, defendant BAHIZAD e-mailed defendant EGHBALI to place an order for United States gift cards, to be paid in U.S. dollars.

Overt Act No. 8:    On September 2, 2015, defendant EGHBALI responded via e-mail, "Ok, thanks.  We also got $5K today from you,

are sending another wire transfer?"

Overt Act No. 9:   On September 2, 2015, defendant BAHIZAD replied via e-mail that "28K" would be in defendant EGHBALI's account by Friday or Monday.

Overt Act No. 10:   On August 2, 2016, defendant BAHIZAD caused $2,541.13 to be wired from an entity with the initials A.C.C. in the United Kingdom into defendant EGHBALI's Bank of America account (ending in 7246).

Overt Act No. 11:   On August 2, 2016, defendant EGHBALI confirmed via e-mail to an employee from Company 1 that any time a payment was received by an entity A.C.C. it was really Company 5.

Overt Act No. 12:   On July 23, 2018, defendant BAHIZAD caused $45,000 to be wired into defendant EGHBALI's Bank of America account (ending in 7246).

Overt Act No. 13:   On July 23, 2018, defendant BAHIZAD e-mailed defendant EGHBALI asking for his statement as of May 2018 after receiving the recent payment.

Overt Act No. 14:   On July 25, 2018, defendant BAHIZAD caused $3,587.11 to be wired into defendant EGHBALI's Bank of America account (ending in 7246).

Overt Act No. 15:   On November 28, 2018, defendant BAHIZAD received at his Company 5 e-mail address a statement from Company 1 itemizing dozens of invoices with a balance due of $20,008.41 and listing an entity with the initials B.O.P as the purchaser.

Overt Act No. 16:   Between December 17, 2018, and December 20, 2018, in response to an e-mail from California Bank & Trust's compliance department regarding Company 1's business operations and international transactions, defendant EGHBALI e-mailed California

Bank & Trust and represented that Company 1 had policies designed to prevent transactions with entities inside countries subject to OFAC sanctions, stating, "[w]e are strictly B2B and all entity or businesses want to open an account with us has to go thru DNB check, OFAC SDN check list and state or country of origin Business license verifications."

Overt Act No. 17:   On April 9, 2019, defendant EGHBALI sent an e-mail to defendant BAHIZAD at his Company 5 e-mail address asking for defendant BAHIZAD to "remit payment at your earliest convenience" for the attached statement.  The attached statement, addressed to B.O.P. (Jebel Ali branch), itemized approximately 70 invoice numbers from January 2, 2018, to April 5, 2019, and listed payments on July 23, 2018, for $45,000 and on July 25, 2018, for $3,587.11.

Overt Act No. 18:   On July 8, 2019, defendant BAHIZAD e-mailed defendant EGHBALI to place another order for United States gift cards, to be paid in U.S. dollars.

Overt Act No. 19:   On July 9, 2019, defendant BAHIZAD e-mailed defendant EGHBALI stating that he received an invoice and "codes" for the gift cards but that he was waiting for more codes.

Overt Act No. 20:   On July 11, 2019, defendant EGHBALI sent an e-mail to BAHIZAD apologizing for the delay and stating that he received the "shipment" and would send the "codes" for the gift cards soon.

Overt Act No. 21:   On September 3, 2019, defendant BAHIZAD caused $1,712.67 to be wired from A.C.C. in the United Kingdom into defendant EGHBALI's California Bank & Trust account (ending in 7744).

COUNT TWO

[50 U.S.C. § 1705(c)]

[DEFENDANTS KAMBIZ EGHBALI AND HAMID HAJIPOUR]

18.  The Grand Jury incorporates and realleges the allegations set forth in paragraphs 1 through 13, above, as if fully set forth herein.

A.   OBJECTS OF THE CONSPIRACY

19.  Beginning at least as early as in or around March of 2015, and continuing up to and including at least in or around January of 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendants KAMBIZ EGHBALI, also known as "Cameron Eghbali" ("EGHBALI"), and HAMID HAJIPOUR ("HAJIPOUR") (collectively, the "defendants"), and Co-Conspirator 1, and others known and unknown to the Grand Jury, knowingly conspired and agreed with each other to:

a.   Engage in and cause a transaction that evades and avoids, that has the purpose of evading and avoiding, that causes a violation of, and that attempts to violate an ITSR prohibition, in violation of 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.203;

b.   Export, reexport, sell, and supply, directly and indirectly, from the United States and by a United States person (wherever located), goods, technology, and services to Iran or the Government of Iran, without having first obtained OFAC authorization, in violation of 50 U.S.C. § 1705(a) and (c), and 31 C.F.R. § 560.204.

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

20.  The objects of the conspiracy were to be accomplished in substance as follows:

1        a.    Defendant HAJIPOUR and Co-Conspirator 1 would send

2   orders from Iran to defendant EGHBALI in the Central District of

3   California to request that defendant EGHBALI transfer goods,

4   technology, and services, in the form of digital and physical gift

5   cards loaded with U.S. dollars, to them for the benefit of Company 2

6   and Company 4.

7        b.    Defendant EGHBALI would send defendant HAJIPOUR and

8   Co-Conspirator 1 invoices listing the number, type, and cost of gift

9   cards that he proposed to send them and identifying Company 3 or

10  another entity as the purchaser of the gift cards and listing

11  Company 1 as the seller.

12       c.    Defendant HAJIPOUR and Co-Conspirator 1 would pay

13  defendant EGHBALI for the gift cards by transferring money from Iran

14  to defendant EGHBALI's Bank of America, Wells Fargo, Manufacturers

15  Bank, and California Bank & Trust bank accounts in the United States,

16  using third parties in other countries to conceal from banks and U.S.

17  regulators that the transfers were related to the provision of goods,

18  technology, and services to Iran.

19       d.    Defendant EGHBALI would transfer the requested gift

20  cards in digital and physical form loaded with U.S. dollars to

21  defendant HAJIPOUR and Co-Conspirator 1 in Iran for the benefit of

22  Company 2 and Company 4.

23  C.   OVERT ACTS

24       21.   In furtherance of the conspiracy and to accomplish its

25  objects, on or about the following dates, defendants EGHBALI and

26  HAJIPOUR, and Co-Conspirator 1 and others known and unknown to the

27  Grand Jury, committed various overt acts within the Central District

28  of California and elsewhere, including but not limited to the

1  following:

2      Overt Act No. 1:    After a series of e-mails between defendant

3  EGHBALI and Co-Conspirator 1 on March 27, 2015, and March 28, 2015,

4  Co-Conspirator 1 placed an order with defendant EGHBALI for two $5

5  and one $15 gift cards.

6      Overt Act No. 2:    On March 30, 2015, defendant EGHBALI sent

7  Co-Conspirator 1 an invoice, listing Company 3, for those same three

8  gift cards and stating that the charged total was $25.33.

9      Overt Act No. 3:    On March 30, 2015, Co-Conspirator 1 e-mailed

10  defendant EGHBALI a screenshot confirming a payment for $25.33.

11      Overt Act No. 4:    On March 30, 2015, defendant EGHBALI

12  confirmed with Co-Conspirator 1 that he received the payment and

13  would send the "codes" soon.

14      Overt Act No. 5:    In e-mails exchanged between defendant

15  EGHBALI and Co-Conspirator 1 between April 1, 2015, and April 28,

16  2015, Co-Conspirator 1 placed an order with defendant EGHBALI for

17  approximately 70 gift cards.

18      Overt Act No. 6:    On April 28, 2015, defendant EGHBALI sent

19  Co-Conspirator 1 two invoices itemizing the 70-gift card order: one

20  with a total price as $1,397 that included $45 to ship the physical

21  gift cards and one with a total price of $1,352 without a shipping

22  cost.

23      Overt Act No. 7:    On October 14, 2016, Co-Conspirator 1 e-

24  mailed defendant EGHBALI asking him to e-mail the gift cards to

25  Company 4's e-mail address "[b]ecause after that we want to send our

26  new order asap."

27      Overt Act No. 8:    On October 14, 2016, defendant EGHBALI e-

28  mailed Co-Conspirator 1 to confirm that he received Co-

Conspirator 1's payment of $31,200.

Overt Act No. 9:   In online messages exchanged between defendant EGHBALI and Co-Conspirator 1 on March 20, 2017, defendant EGHBALI asked Co-Conspirator 1 about a payment of $29,000 that was two weeks overdue.

Overt Act No. 10:   On March 20, 2017, Co-Conspirator 1 replied, "No, because sat & sun was holiday in turkey & also today in iran."

Overt Act No. 11:   On March 29, 2017, Co-Conspirator 1 sent defendant EGHBALI an online message, assuring defendant EGHBALI that he had a "sarafi" --- a Farsi word referring to a money exchanger or money exchange service – "in Iran" operated by one of their "trusted brokers" (English translation).

Overt Act No. 12:   On April 3, 2017, Co-Conspirator 1 placed an order with defendant EGHBALI for U.S. gift cards via an online-messaging service.

Overt Act No. 13:   On April 3, 2017, defendant EGBHALI sent Co-Conspirator 1 an invoice for the gift cards via e-mail and later transferred the gift card numbers to Co-Conspirator 1 via a file-sharing service.

Overt Act No. 14:   On April 4, 2017, Co-Conspirator 1 caused $38,121 to be wired into defendant EGHBALI's Bank of America account (ending in 7246).

Overt Act No. 15:   On April 11, 2017, Co-Conspirator 1 caused $36,263 to be wired into defendant EGHBALI's Bank of America account (ending in 7246).

Overt Act No. 16:   On April 13, 2017, defendant EGHBALI sent an invoice to Co-Conspirator 1 for more than 1,000 United States gift cards that defendant EGHBALI transferred to Co-Conspirator 1 via a

file-sharing service.

Overt Act No. 17:   On April 13, 2017, Co-Conspirator 1 caused $28,762 to be wired into defendant EGHBALI's Wells Fargo account (ending in 7246).

Overt Act No. 18:   On July 25, 2017, defendant EGHBALI sent Co-Conspirator 1 an e-mail with an attachment, which defendant EGHBALI stated in the e-mail was for "all the account transactions up to date."  The attachment listed payments (identified above) on April 4, 2017, for $38,121, on April 11, 2017, for $36,263, and on April 13, 2017, for $28,762.

Overt Act No. 24:   On June 8, 2018, defendant HAJIPOUR caused $26,250 to be wired into defendant EGHBALI's Bank of America account (ending in 7246).

Overt Act No. 25:   On June 8, 2018, defendant HAJIPOUR sent an online message to defendant EGHBALI, asking, "Did you receive the $26,250 transfer?" (English translation).

Overt Act No. 26:   During a series of online messages between defendants EGHBALI and HAJIPOUR, in response to defendant EGHBALI saying that he sent the invoice to Co-Conspirator 1, defendant HAJIPOUR told defendant EGHBALI to send it to his Company 4 e-mail address.

Overt Act No. 27:   On July 9, 2018, defendant HAJIPOUR sent an online message to defendant EGHBALI expressing his frustration with the difficulties of doing transfers from "Iran" and asked defendant EGHBALI if he would consider accepting Western Union.  Defendant HAJIPOUR indicated that he had obtained the right to represent Western Union in Turkey, which would make transferring money to defendant EGHBALI easier.

14

1    Overt Act No. 28:   On July 9, 2018, defendant EGHBALI responded

2   that he was unsure how to do what defendant HAJIPOUR had asked and

3   would need time to check.

4    Overt Act No. 29:   On July 11, 2018, defendant HAJIPOUR caused

5   $26,000 to be wired into defendant EGHBALI's Bank of America account

6   (ending in 7246).

7    Overt Act No. 30:   On July 12, 2018, defendant HAJIPOUR

8   informed defendant EGHBALI that he had received a $26,000 receipt in

9   exchange for an order of United States gift cards previously placed

10  with defendant EGHBALI.

11   Overt Act No. 31:   On July 26, 2018, defendant EGHBALI e-mailed

12  defendant HAJIPOUR, at the Company 4 e-mail address, an invoice (No.

13  133085) listing Company 3 as the recipient for a balance of

14  $22,002.90.

15   Overt Act No. 32:   On July 27, 2018, defendant HAJIPOUR caused

16  $21,972 to be wired into defendant EGHBALI's Bank of America account

17  (ending in 7246).

18   Overt Act No. 33:   On August 1, 2018, defendant HAJIPOUR sent

19  defendant EGHBALI an online message indicating that he would be

20  grateful if defendant EGHBALI would allow him to send money via

21  Western Union, even if temporarily, because defendant EGHBALI knew

22  "the situation" (English translation).  Defendant HAJIPOUR wrote that

23  the Western Union transfer would be in "the name of a foreigner"

24  (English translation).

25   Overt Act No. 34:   On August 1, 2018, Defendant EGHBALI

26  responded by asking if defendant HAJIPOUR was available for a call.

27   Overt Act No. 35:   On August 2, 2018, defendant EGHBALI wrote

28  to defendant HAJIPOUR in an online message, "Please send To Kambiz

Eghbali.  Please make sure send [sic] a Money Order."

Overt Act No. 36:   On September 4, 2018, defendant HAJIPOUR caused $18,975 to be wired from an entity with the initials D.C. in Malaysia into defendant EGHBALI's Bank of America account (ending in 7246).

Overt Act No. 37:   On September 7, 2018, defendant HAJIPOUR sent an online message to defendant EGHBALI asking if he was updated on "Iran events" (English translation) and explained that he was losing money with the fluctuation of the dollar and proposed a solution.  With defendant EGHBALI's "permission" (English translation), defendant HAJIPOUR asked if he could purchase the dollar in Turkey and send it to defendant EGHBALI via Western Union as soon as defendant HAJIPOUR noticed the value of the dollar rising to minimize the loss.

Overt Act No. 38:   Defendant EGHBALI then called defendant HAJIPOUR using an online message service.

Overt Act No. 39:   On September 10, 2018, defendant HAJIPOUR, via e-mail, placed an order with defendant EGHBALI for $10,000 worth of United States gift cards.

Overt Act No. 40:   That same day, defendant HAJIPOUR sent an online message to defendant EGHBALI stating that he had transferred "10k" from Turkey and that the deposit would come from "inside America" (English translation).

Overt Act No. 41:   Defendant HAJIPOUR e-mailed defendant EGHBALI a photograph of a deposit slip, which showed that $10,000 was sent to defendant EGHBALI's Bank of America account (ending in 7246) from an over-the-counter transaction at a Bank of America branch within America.

Overt Act No. 42:   On September 10, 2018, defendant HAJIPOUR caused two $2,500 money orders from PLS (an authorized Western Union transfer agent) and five $1,000 money orders from Western Union to be deposited into defendant EGHBALI's account at Bank of America (ending in 7246).

Overt Act No. 43:   On September 17, 2018, defendant HAJIPOUR e-mailed defendant EGHBALI to ask whether defendant HAJIPOUR should transfer additional funds to defendant EGHBALI via a "new account" and asked for the "bank's name."

Overt Act No. 44:   On September 17, 2018, Defendant EGHBALI responded by providing the name of California Bank & Trust, along with additional account information to facilitate the wire transfers.

Overt Act No. 45:   On October 25, 2018, defendant HAJIPOUR sent an e-mail to himself (from his personal e-mail address to the Company 4 e-mail address) with the subject line "bank info cameron [Company 1]" and with an attachment that had defendant EGHBALI/Company 1's bank account information for defendant EGHBALI's California Bank & Trust account (ending in 7744) and wire instructions in both the United States and Europe.

Overt Act No. 46:   Between December 17, 2018, and December 20, 2018, in response to an e-mail from California Bank & Trust's compliance department regarding Company 1's business operations and international transactions, defendant EGHBALI e-mailed California Bank & Trust and represented that Company 1 had policies designed to prevent transactions with entities inside countries subject to OFAC sanctions, stating, "[w]e are strictly B2B and all entity or businesses want to open an account with us has to go thru DNB check, OFAC SDN check list and state or country of origin Business license

17

verifications."

Overt Act No. 47:   On December 26, 2018, defendant HAJIPOUR caused $14,072 to be wired from an entity, D.C., in Malaysia into defendant EGHBALI's California Bank & Trust account (ending in 7744).

Overt Act No. 48:   On December 28, 2018, defendant HAJIPOUR caused $13,085 to be wired from an entity, D.C., in Malaysia into defendant EGHBALI's California Bank & Trust account (ending in 7744).

Overt Act No. 49:   On January 8, 2019, defendant HAJIPOUR caused $13,572 to be wired from an entity, D.C., in Malaysia into defendant EGHBALI's California Bank & Trust account (ending in 7744).

Overt Act No. 50:   On January 9, 2019, Company 1 sent defendant HAJIPOUR an e-mail to his Company 4 e-mail address with a link to "e-codes" and with a message that stated, "Hi Hamid, Codes (codes@[Company1].com) invited you to view the file '140472-ecordes.zip' on [the file-sharing service]."

COUNT THREE

[18 U.S.C. § 1349]

[DEFENDANTS KAMBIZ EGHBALI AND BABAK BAHIZAD]

22.  The Grand Jury incorporates and realleges the allegations set forth in paragraphs 1 through 13, above, as if fully set forth herein.

A.  OBJECT OF THE CONSPIRACY

23.  Beginning no later than March of 2014 and continuing up to and including at least September of 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendants KAMBIZ EGHBALI, also known as "Cameron Eghbali" ("EGHBALI") and BABAK BAHIZAD ("BAHIZAD") (collectively, the "defendants"), and others known and unknown to the Grand Jury, knowingly conspired to commit bank fraud, in violation of Title 18, United States Code, Section 1344(2).

B.  MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED

24.  The object of the conspiracy was to be accomplished in substance as follows:

a.  The Grand Jury re-alleges and incorporates paragraph 16 of Section B of Count One of this Indictment.

C.  OVERT ACTS

25.  In furtherance of the conspiracy and to accomplish its object, on or about the following dates, defendants EGHBALI and BAHIZAD, and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California and elsewhere, including but not limited to the following:

<u>Overt Act Nos. 1 through 21</u>:  The Grand Jury re-alleges and incorporates Overt Act No. 1 through Overt Act No. 21 of Section C of Count One of this Indictment.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>COUNT FOUR</u>

[18 U.S.C. § 1349]

[DEFENDANTS KAMBIZ EGHBALI AND HAMID HAJIPOUR]

26.   The Grand Jury incorporates and realleges the allegations set forth in paragraphs 1 through 13 above, as if fully set forth herein.

A.   <u>OBJECT OF THE CONSPIRACY</u>

27.   Beginning no later than March of 2015 and continuing up to and including at least January of 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendants KAMBIZ EGHBALI, also known as "Cameron Eghbali" ("EGHBALI"), and HAMID HAJIPOUR ("HAJIPOUR") (collectively, the "defendants"), and Co-Conspirator 1, and others known and unknown to the Grand Jury, knowingly conspired to commit bank fraud, in violation of Title 18, United States Code, Section 1344(2).

B.   <u>MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE</u>
   <u>ACCOMPLISHED</u>

28.   The object of the conspiracy was to be accomplished in substance as follows:

a.   The Grand Jury re-alleges and incorporates paragraph 20 of Section B of Count Two of this Indictment.

C.   <u>OVERT ACTS</u>

29.   In furtherance of the conspiracy and to accomplish its object, on or about the following dates, defendants EGHBALI and HAJIPOUR, and Co-Conspirator 1 and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California and elsewhere, including but not limited to the following:

21

Overt Act Nos. 1 through 50:  The Grand Jury re-alleges and incorporates Overt Act No. 1 through Overt Act No. 50 of Section C of Count Two of this Indictment.

1

COUNT FIVE

2

[18 U.S.C. § 1956(h)]

3

[DEFENDANTS KAMBIZ EGHBALI AND BABAK BAHIZAD]

4    30.   The Grand Jury incorporates and realleges the allegations

5    set forth in paragraphs 1 through 13, above, as if fully set forth

6    herein.

7    D.   OBJECT OF THE CONSPIRACY

8    31.   Beginning no later than March of 2014 and continuing up to

9    and including at least September of 2019, in Los Angeles County,

10   within the Central District of California, and elsewhere, defendants

11   KAMBIZ EGHBALI, also known as "Cameron Eghbali" ("EGHBALI") and BABAK

12   BAHIZAD ("BAHIZAD") (collectively, the "defendants"), and others

13   known and unknown to the Grand Jury, conspired and agreed with each

14   other to transport, transmit, and transfer, and attempt to transport,

15   transmit, and transfer, funds to a place in the United States from a

16   place outside of the United States, with the intent to promote the

17   carrying on of specified unlawful activity -- namely, the violation

18   of IEEPA, in violation of Title 50, United States Code, Section

19   1705(a), (c); and financial institution fraud, in violation of Title

20   18, United States Code, Section 1344 -- in violation of Title 18,

21   United States Code, Section 1956(a)(2)(A).

22   E.   MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE

23        ACCOMPLISHED

24   32.   The object of the conspiracy was to be accomplished in

25   substance as follows:

26        a.   The Grand Jury re-alleges and incorporates paragraph

27   16 of Section B of Count One of this Indictment.

28

23

1   F.   OVERT ACTS

2        33.  In furtherance of the conspiracy and to accomplish its

3   object, on or about the following dates, defendants EGHBALI and

4   BAHIZAD, and others known and unknown to the Grand Jury, committed

5   various overt acts within the Central District of California and

6   elsewhere, including but not limited to the following:

7        Overt Act Nos. 1 through 21:  The Grand Jury re-alleges and

8   incorporates Overt Act No. 1 through Overt Act No. 21 of Section C of

9   Count One of this Indictment.

1          COUNT SIX

2        [18 U.S.C. § 1956(h)]

3    [DEFENDANTS KAMBIZ EGHBALI AND HAMID HAJIPOUR]

4        34.  The Grand Jury incorporates and realleges the allegations

5    set forth in paragraphs 1 through 13, above, as if fully set forth

6    herein.

7    A.    OBJECT OF THE CONSPIRACY

8        35.  Beginning no later than March of 2015 and continuing up to

9    and including at least January of 2019, in Los Angeles County, within

10   the Central District of California, and elsewhere, defendants KAMBIZ

11   EGHBALI, also known as "Cameron Eghbali" ("EGHBALI"), and HAMID

12   HAJIPOUR ("HAJIPOUR") (collectively, the "defendants"), and Co-

13   Conspirator 1, and others known and unknown to the Grand Jury,

14   conspired and agreed with each other to transport, transmit, and

15   transfer, and attempt to transport, transmit, and transfer, funds to

16   a place in the United States from a place outside of the United

17   States, with the intent to promote the carrying on of specified

18   unlawful activity -- namely, the violation of IEEPA, in violation of

19   Title 50, United States Code, Section 1705(a), (c); and financial

20   institution fraud, in violation of Title 18, United States Code,

21   Section 1344 -- in violation of Title 18, United States Code, Section

22   1956(a)(2)(A).

23   B.    MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE

24         ACCOMPLISHED

25       36.  The object of the conspiracy was to be accomplished in

26   substance as follows:

27            a.   The Grand Jury re-alleges and incorporates paragraph

28   20 of Section B of Count Two of this Indictment.

25

C.    <u>OVERT ACTS</u>

37.    In furtherance of the conspiracy and to accomplish its object, on or about the following dates, defendants EGHBALI and HAJIPOUR, and Co-Conspirator 1 and others known and unknown to the Grand Jury, committed various overt acts within the Central District of California and elsewhere, including but not limited to the following:

<u>Overt Act Nos. 1 through 50</u>:  The Grand Jury re-alleges and incorporates Overt No. 1 through Overt Act No. 50 of Section C of Count Two of this Indictment.

1              FORFEITURE ALLEGATION ONE

2          [18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

3      1. Pursuant to Rule 32.2 of the Federal Rules of Criminal

4  Procedure, notice is hereby given that the United States of America

5  will seek forfeiture as part of any sentence, pursuant to Title 18,

6  United States Code, Section 981(a)(1)(C) and Title 28, United States

7  Code, Section 2461(c), in the event of any defendant's conviction of

8  the offenses set forth in any of Counts One or Two of this

9  Indictment.

10     2.  Any defendant so convicted shall forfeit to the United

11  States of America the following property:

12          (a)  All right, title and interest in any and all property,

13  real or personal, constituting, or derived from, any proceeds

14  traceable to any such offense; and

15          (b)  To the extent such property is not available for

16  forfeiture, a sum of money equal to the total value of the property

17  described in subparagraph (a).

18     3.  Pursuant to Title 21, United States Code, Section 853(p), as

19  incorporated by Title 28, United States Code, Section 2461(c), any

20  defendant so convicted shall forfeit substitute property, up to the

21  total value of the property described in the preceding paragraph if,

22  as the result of any act or omission of said defendant, the property

23  described in the preceding paragraph, or any portion thereof: (a)

24  cannot be located upon the exercise of due diligence; (b) has been

25  transferred, sold to or deposited with a third party; (c) has been

26  placed beyond the jurisdiction of the court; (d) has been

27  substantially diminished in value; or (e) has been commingled with

28  other property that cannot be divided without difficulty.

27

1

## FORFEITURE ALLEGATION TWO

[18 U.S.C. § 982]

1.     Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(2), in the event of any defendant's conviction of the offenses set forth in any of Counts Three or Four of this Indictment.

2.     Any defendant so convicted shall forfeit to the United States of America the following:

(a) All right, title and interest in any and all property, real or personal, constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the offense; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

1                   FORFEITURE ALLEGATION THREE

2                      [18 U.S.C. § 982]

3        1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal

4   Procedure, notice is hereby given that the United States will seek

5   forfeiture as part of any sentence, pursuant to Title 18, United

6   States Code, Section 982(a)(1), in the event of any defendant's

7   conviction of the offenses set forth in any of Counts Five or Six of

8   this Indictment.

9        2.   Any defendant so convicted shall forfeit to the United

10  States of America the following:

11          (a)   Any property, real or personal, involved in such

12  offense, and any property traceable to such property; and

13          (b)   To the extent such property is not available for

14  forfeiture, a sum of money equal to the total value of the property

15  described in subparagraph (a).

16       3.   Pursuant to Title 21, United States Code, Section 853(p), as

17  incorporated by Title 18, United States Code, Section 982(b)(1), and

18  Title 18, United States Code, Section 982(b)(2), any defendant so

19  convicted shall forfeit substitute property, if, by any act or

20  omission of said defendant, the property described in the preceding

21  paragraph, or any portion thereof: (a) cannot be located upon the

22  exercise of due diligence; (b) has been transferred, sold to, or

23  deposited with a third party; (c) has been placed beyond the

24  jurisdiction of the court; (d) has been substantially diminished in

25  value; or (e) has been commingled with other property that cannot be

26  divided without difficulty. Substitution of assets shall not be

27  ordered, however, where the convicted defendant acted merely as an

28  intermediary who handled but did not retain the property in the

1   course of the money laundering offense unless the defendant, in

2   committing the offense or offenses giving rise to the forfeiture,

3   conducted three or more separate transactions involving a total of

4   $100,000.00 or more in any twelve-month period.

5

6

7                                    A TRUE BILL

8

9                                    _/s/_____

10                                   Foreperson

11   E. MARTIN ESTRADA
     United States Attorney

12

13

14   CAMERON L. SCHROEDER
     Assistant United States Attorney

15   Chief, National Security Division

16   DAVID T. RYAN
     Assistant United States Attorney

17   Chief, Terrorism and Export Crimes Section

18   ANNA P. BOYLAN
     Assistant United States Attorney

19   Terrorism and Export Crimes Section

20   DAVID J. RYAN
     Trial Attorney

21   United States Department of Justice
     Counterintelligence and Export Control Section

22

23

24

25

26

27

28